IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| OCTAVIA MACKEY, § | |
| § | |
| Plaintiff § | |
| § | |
| v. § | Civil Action No. 3:10-CV-2263-BK |
| § | |
| MICHAEL J. ASTRUE, § | |
| Commissioner of Social Security, § | |
| § | |
| Defendant. § | |

## MEMORANDUM OPINION

Pursuant to the parties' consent to proceed before the magistrate judge (Doc. 20), this case has been transferred to the undersigned for a final ruling. For the reasons discussed herein, the Plaintiff's *Motion for Summary Judgment* (Doc. 21) is **DENIED**, and the Defendant's *Motion for Summary Judgment* (Doc. 22) is **GRANTED**. The decision of the Commissioner of Social Security is **AFFIRMED**.

### I. BACKGROUND[1]

**A.    Procedural History**

Octavia Mackey (Plaintiff) seeks judicial review of a final decision by the Commissioner denying her claim for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB) under the Social Security Act. In July 2008, Plaintiff filed for SSI and DIB, claiming that she had been disabled since February 2001 due to coronary artery disease and depression. (Tr. at

---

[1] The following background comes from the transcript of the administrative proceedings, which is designated as "Tr."

1

13, 29, 53-60, 135). Her application was denied initially and on reconsideration, and Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 78). She personally appeared with counsel and testified at a hearing held in December 2009. (Tr. at 13, 92). In January 2010, the ALJ found Plaintiff not disabled. (Tr. at 10-21). In September 2010, the Appeals Council denied Plaintiff's request for review, and the ALJ's decision became the final decision of the Commissioner. (Tr. at 3-5). Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g).

**B.** **Factual History**

    **1.** **Age, Education, and Work Experience**

Plaintiff was 38 years old on her disability onset date and 47 years old at the time of the administrative hearing. She had a high school education and one year of college. (Tr. at 19, 135, 180). Plaintiff previously worked as a cook's helper and supervisor. (Tr. at 19).

    **2.** **Medical Evidence Before the ALJ**

Plaintiff sought medical attention for a work-related injury in January 2001, complaining of right wrist pain and numbness in her fingers and thumb. (Tr. at 323). Later that month, she had numbness in the right upper extremity, and in February 2001, she had right carpal tunnel release and right wrist block surgery. (Tr. at 324).

In November 2001, Plaintiff went to the hospital where she was treated for gastroesophageal reflux ("GERD") and chest pain. (Tr. at 267). The following month, her spinal X-rays revealed slight disc space narrowing at C5-6 of the cervical spine and anterior and

2

posterior osteophytes (bony outgrowths or protuberances).[2] (Tr. at 439). In May 2002, Plaintiff experienced chest pain; upon admission to the hospital, she had a cardiac catheterization (insertion of a catheter into the heart artery to reveal potential problems) performed and was diagnosed with coronary artery disease and hypertension. (Tr. at 248, 258, 260). Plaintiff had several complaints of chest pain from May 2002 to May 2004, and her diagnosis remained the same. (Tr. at 277-79, 282-85, 290-92).

In December 2004, Plaintiff went to the emergency room following a car accident, and X-rays of her cervical spine showed degenerative spondylosis at C-5/C-6 (stiffening of the vertebra or a lesion of the spine of a degenerative nature). (Tr. at 363, 367). She received chiropractic treatment for a month for pain and muscle tightness, mainly in her lower back. (Tr. at 345-55). She was involved in another car accident in February 2005 and complained of head, lower back, and leg pain. (Tr. at 372, 374). A cervical spine X-ray revealed anterior spurring at C-5, and a lumbar X-ray revealed mild degenerative changes. (Tr. at 378, 380). She was discharged with pain medication. (Tr. at 381).

Plaintiff presented to the hospital with complaints of chest pain in March and November 2005, and she was again diagnosed with coronary artery disease and GERD. (Tr. at 298-99, 312-13). In October 2006, following a myocardial infarction (heart attack), Plaintiff underwent a cardiac catheterization. This procedure revealed that Plaintiff's right coronary artery was totally occluded, and there was moderate narrowing of the left anterior artery. (Tr. at 441, 451-52); *Attorneys Medical Advisor*, Ch. 23 III (available on Westlaw database, updated March 2011).

---

[2] Unless otherwise noted, all medical terms have been defined by reference to *Stedman's Medical Dictionary* (27th ed. 2000), available on Westlaw.

Due to the occlusion, Plaintiff underwent an angioplasty (recanalization of a blood vessel) with stenting (insertion of a thread or rod to provide support for a structure) of the right coronary artery. (Tr. at 453-54). In November 2006 and October 2007, Plaintiff continued to report occasional chest pain. (Tr. at 330, 332). During the latter visit, she also reported feeling fatigued and feeling dizzy if she rose too quickly. (Tr. at 330).

In December 2007, Plaintiff went to the emergency room for neck and arm pain which occurred after she lifted a three-year-old child. (Tr. at 382-83, 385). She was given medication and discharged. (Tr. at 388). In February 2008, Plaintiff underwent a stress test, and her myocardial imaging results demonstrated a small amount of inferolateral ischemia (arterial narrowing or disruption of the blood supply). Testing also revealed abnormal wall motion with an estimated ejection fraction (the fraction of blood contained in the ventricle that is expelled during its contraction) of 56 percent and inferolateral hypokinesis (diminished or slow movement).[3] (Tr. at 337). An April 2008 echocardiogram revealed normal heart chamber and valve sizes, mildly depressed left ventricular function, an estimated ejection fraction of 48 percent with hypokinesis, and mild triscuspid and mitral regurgitation (regurgitation of blood through the valve, caused by ischemic heart disease). (Tr. at 333).

In October 2008, state examining physician Dr. Bob Dodd opined that Plaintiff could (1) occasionally lift and carry ten pounds, (2) frequently lift and carry less than ten pounds, (3) stand and/or walk at least two hours in an eight-hour workday, and (4) sit for six hours in a workday. (Tr. at 419-20). However, Dr. Dodd found that Plaintiff could only occasionally reach in all

---

[3] Normal ejection fraction is .55 or greater, but with the onset of congestive heart failure, the ejection fraction decreases, sometimes to .10 or even less in severe cases.

directions. (Tr. at 421). In December 2008, state examining physician Dr. Moira Dolan affirmed Dr. Dodd's RFC assessment. (Tr. at 475).

In January 2009, Plaintiff went to the emergency room for an acute inferior myocardial infarction, and she underwent an emergency cardiac catheterization which revealed 100 percent occlusion of the mid right coronary artery, and 70 percent stenosis of the right posterolateral artery and left anterior descending artery. (Tr. at 514-15). Plaintiff underwent an angioplasty and a stenting procedure. (Tr. at 514-15). In March 2009, Plaintiff underwent another cardiac catheterization, which indicated 100 percent stenosis of the mid left anterior descending artery, so she had another angioplasty and stenting of the mid left anterior descending artery. (Tr. at 484-86). As of May 2009, Plaintiff reported that she was feeling good. (Tr. at 560).

Plaintiff also underwent a number of psychological evaluations in connection with her DIB and SSI application. Dr. Gerald Stephenson conducted a consultative examination in August 2007, during which Plaintiff stated that she slept a lot, had poor concentration, and was usually anxious. (Tr. at 236). She was unable to recall objects after three minutes, a relevant current event, or her Social Security number. (Tr. at 239). Plaintiff was able to clean her house, but it took her all day. (Tr. at 237). Dr. Stephenson noted she could not follow three-step instructions, she suffered from depression and anxiety, most likely caused by her first heart attack, and she had attendant memory and concentration problems. (Tr. at 239-40).

Dr. Lawrence Sloan performed a consultative psychological examination in October 2008, during which Plaintiff reported feeling sad, sleeping poorly, variable appetite, passive suicidal ideation, poor concentration, and marked fatigue. (Tr. at 398-99). Plaintiff reported that she was able to groom and dress herself, shop for food, cook, wash clothes, pay bills, and clean

5

her home, although she sometimes did not complete her daily chores due to pain. (Tr. at 399). She was able to name three presidents, her mood was moderately depressed, she was able to repeat a phrase after several attempts, and her memory and judgment were marginal. (Tr. at 400-01). Dr. Sloan diagnosed Plaintiff with major depressive disorder (moderate and chronic) and possible borderline intellectual functioning, and he determined that her prognosis was guarded. (Tr. at 401).

### 3. Hearing Testimony

At her December 2009 hearing before the ALJ, Plaintiff testified that since her first heart attack in 2001, she could hardly lift anything nor could she do much standing or sitting due to her back and neck pain. (Tr. at 33-34). She stated that she could walk half a block, prepare some meals, do laundry sometimes, and drive occasionally, but she did not grocery shop anymore due to anxiety from being around other people. (Tr. at 34-35). Plaintiff noted that she did not seek professional mental healthcare due to her financial problems, and her niece cleaned her house for her because the exertion caused Plaintiff's chest to hurt. (Tr. at 35-36). She had been taking care of her five-year-old grandson since he was nine months old. (Tr. at 36).

A medical expert ("ME") testified that although Plaintiff had coronary disease since 2001, she had never met or equaled a Listing because she was either asymptomatic on medication or with a normal exercise capacity or she had stenting which caused her to be asymptomatic as of May 2009. (Tr. at 43-44). A vocational expert ("VE") testified that a hypothetical individual of Plaintiff's condition, who was limited to lifting no more than ten pounds, could stand and walk up to two hours a day, had to maneuver her posture occasionally, and could only do "simple" work, could do sedentary work as a surveillance system monitor, a nut sorter, or a dowel

inspector. (Tr. at 44-45). On cross-examination, the VE stated that if such a person was unable to follow three-step instructions or recall information after a short delay, she would not be able to perform those jobs. (Tr. at 45).

### C. The ALJ's Findings

The ALJ determined that Plaintiff had the severe impairments of coronary artery disease and major depressive disorder, but did not meet or equal a Listing. (Tr. at 15-16). Next, the ALJ ruled that Plaintiff had the residual functional capacity ("RFC") to (1) lift and carry ten pounds occasionally, (2) stand and/or walk for two hours out of an eight-hour day, (3) sit for unlimited periods of time, (4) occasionally stoop, bend, crouch, crawl, or balance, and (5) perform simple work. (Tr. at 16).

As to her heart disease, the ALJ stated that Plaintiff had reported feeling well in April 2008 and May 2009, and she had not been entirely compliant with her treatment and medications as evidenced by November 2005 medical records revealing that she had not been seen for a year and had run out of her medicine in July 2004. (Tr. at 18). Additionally, the ALJ noted that Plaintiff had some psychological problems, but she had not sought psychiatric treatment and was able to complete all activities of daly living as well as maintain contact with family and friends. (Tr. at 18-19). The ALJ stated that she had considered the RFCs of the examining physicians and given them "some weight," and those conclusions bolstered her finding that Plaintiff was not disabled. (Tr. at 19). The ALJ concluded that while Plaintiff could not perform her past relevant work, she could do the limited range of unskilled sedentary work specified by the VE. (Tr. at 20).

## II. ANALYSIS

A. <u>**Legal Standards**</u>

    1. **Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or no contrary medical findings. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The relevant law and regulations governing the determination of disability under the SSI program are identical to those governing the determination of eligibility under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 n.1 (5th Cir. 1985). Thus, the Court may rely on decisions in both areas, without distinction, in reviewing an ALJ's decision. Id. passim.

    2. **Disability Determination**

The definition of disability under the Social Security Act is the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Pursuant to 20 C.F.R. § 404.1520(d), if a claimant has an impairment which meets the duration requirement and is listed in Appendix 1 or is equal to a listed impairment, the claimant is deemed disabled without consideration of age, education, and work experience.

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b-(f)). Under the first four steps of the analysis, the burden of proof lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the

9

burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by expert vocational testimony or by reference to the Medical-Vocational Guidelines of the regulations as long as the claimant either suffers from only exertional impairments or his non-exertional impairments do not significantly affect his RFC. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

**B.    Issues for Review**

    **1.    Whether the ALJ's RFC Finding is Supported by Substantial Evidence**

Plaintiff argues that the ALJ never stated the basis for her RFC, indicated how the ME's testimony impacted the RFC limitations or how much weight she gave the ME's testimony, and, moreover, the ME did not offer an opinion on Plaintiff's ability to function. (Doc. 21 at 9-11). Further, Plaintiff contends, the ALJ erred by not stating what weight she gave the state examining physicians' opinions and issued an RFC in conflict with those opinions. (*Id.* at 11-13, 14-16). In particular, examining physician Dr. Dodd opined that Plaintiff could reach in all directions only occasionally, and Dr. Dolan affirmed that assessment. (*Id.*). Further, Plaintiff alleges that Drs. Dodd and Dolan did not have information about her January 2009 myocardial infarction and two other angioplasty and stenting procedures. (*Id.* at 12). Plaintiff argues that the ALJ's RFC thus did not take into consideration these later medical issues, and her failure to ask the ME about their effect on Plaintiff's RFC was error. (*Id.* at 12).

Next, Plaintiff argues that she is unable to work as either a dowel inspector or a nut sorter because those jobs require frequent reaching, and she cannot work as a surveillance system monitor because it is no longer a sedentary, unskilled job. (*Id.* at 12-14). She also asserts that

the hypothetical question asked of the VE was faulty because it did not include her reaching limitations as stated by the state examining physicians. (*Id.* at 14).

The government responds that the ALJ's RFC determination is supported by substantial evidence, namely Plaintiff's testimony as to her physical abilities and the medical evidence which revealed that she did not have significant back problems and was stable on her heart medicine. (Doc. 23 at 5-7). As to her supposed inability to frequently reach, the government argues that those limitations are not supported by the record. (*Id.* at 8).

The RFC is an assessment, based on all of the relevant evidence, of a claimant's ability to do work on a sustained basis in an ordinary work setting despite her impairments. 20 C.F.R. § 404.1545(a); *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001). The RFC is considered by the ALJ, along with the claimant's age, education and work experience, in determining whether the claimant can work. 20 C.F.R. § 404.1520(f). The ALJ makes the RFC determination by considering the claimant's ability to lift weight, sit, stand, push, pull, etc. 20 C.F.R. §§ 404.1545(b), 416.945(b).

In assessing RFC, the ALJ must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not severe. SSR 96-8p; 20 C.F.R. § 404.1523. Unless she gives the treating physician's opinion controlling weight, the ALJ must explain the weight accorded to the opinions of a state agency examining physician. 20 C.F.R. § 404.1527(f)(2)(ii). Nevertheless, the harmless error doctrine applies in Social Security disability cases, and procedural perfection is not required as long as the claimant's substantial rights have not been affected by an ALJ's error. *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1998).

Plaintiff's argument that the ALJ never stated the basis for her RFC is belied by the record because the ALJ first assessed the nature of Plaintiff's heart and psychological impairments and then determined, based on the objective medical evidence, Plaintiff's reported symptoms, and the doctors' opinions, that Plaintiff had the RFC stated. (Tr. at 16-17). The ALJ noted that Plaintiff's symptoms were not credible to the extent they conflicted with the objective medical evidence of record, which revealed that she was feeling well as of April 2008, had stabilized after her heart attacks, and had been asymptomatic since May 2009. (Tr. at 17-18). The ALJ also stated that the psychological assessments indicated that Plaintiff had some depression, but she had not sought treatment and was able to do many activities of daily living, which further supported her RFC. (Tr. at 18-19).

Plaintiff's next complaint is that the ALJ did not indicate the weight or impact of the ME's testimony on her RFC limitations, and the ME did not offer an opinion on Plaintiff's ability to function. ALJs may ask for and consider opinions from MEs on the nature and severity of a claimant's impairments and on whether the impairment equals a Listing. 20 C.F.R. § 404.1527(f)(2)(iii). When ALJs consider ME opinions, they must accord weight to them depending on the degree to which the ME provides supporting explanations for his opinion and the degree to which the opinion considers the pertinent evidence of record. 20 C.F.R. § 404.1527(d), (f)(2)(iii). Generally, the more consistent an ME's opinion is with the record as a whole, the more weight the ALJ will give that opinion. *Id.*

Any failure by the ALJ to indicate the weight given to the ME's testimony is harmless error because the ME testified that Plaintiff did not meet or equal a Listing. While the ME did not offer an opinion on Plaintiff's ability to function, the regulations provide for ME testimony

only about the nature and severity of a claimant's impairment and whether the impairment meets a Listing. It is the ALJ's role to determine, as a final matter, a claimant's RFC, the severity of the impairment, and the application of the vocational factors. 20 C.F.R. § 404.1527(e)(2). Thus, Plaintiff's argument on this point fails.

As for Plaintiff's next point of error, she is correct that the ALJ did not explain the weight given to the examining physicians' opinions that Plaintiff was limited to reaching only occasionally. Nevertheless, such error was harmless because that limitation is not supported by the record evidence. Plaintiff's cervical spine x-rays revealed only mild degenerative disc disease. (Tr. at 363, 367, 378, 439). During her chiropractic treatment, she mainly complained of lower back pain and muscle tightness and did not mention any difficulty in reaching. (Tr. at 345-55). There is no evidence in the record of any problems with Plaintiff's reaching ability. Therefore, the ALJ's failure to explain the weight given to Dr. Dodd's and Dr. Dolan's reaching limitations is harmless error. *Morris*, 864 F.2d at 335.

Additionally, Plaintiff's argument that the RFC did not take into consideration her 2009 myocardial infarction and two angioplasty and stenting procedures is inaccurate. The ALJ clearly stated that Plaintiff had had at least four heart attacks, she had heart medicine prescriptions filled several times in 2009, she had stents placed in January 2009 and March 2009, and in May 2009 she reported that she had no chest pain. (Tr. at 18). The ALJ, thus, clearly reviewed the 2009 medical records.

Finally, Plaintiff's argument that, due to her reaching limitations, she is unable to work as either a dowel inspector or a nut sorter is moot because, as noted above, the medical evidence does not support a reaching limitation. Moreover, even assuming Plaintiff cannot work as a

13

surveillance system monitor because it is not sedentary, she can perform the other jobs listed by the VE and ALJ.

2.      **Whether the ALJ Failed to Weigh the Psychological Opinion Evidence**

Plaintiff argues that the ALJ failed to give weight to the psychological assessments of Dr. Stephenson and Dr. Sloan. (Doc. 21 at 14-16). Moreover, Plaintiff maintains, if the ALJ decided to reject their psychological opinions that Plaintiff had a poor memory, the ALJ should have explained her reasoning. (*Id.* at 16-17).

The government responds that Plaintiff cannot demonstrate any prejudice stemming from the ALJ's failure to accept Dr. Stephenson's opinion that Plaintiff could not follow three-step instructions because the jobs of dowel inspector and nut sorter only involve two-step instructions. (Doc. 23 at 9-10).

Unless the treating source's opinion is given controlling weight, the ALJ must explain the weight given to the opinions of a consulting psychologist. 20 C.F.R. § 404.1527(f)(2)(ii). The ALJ must evaluate the psychologist's findings considering his or her medical specialty and expertise, the supporting evidence in the record, and any supporting explanations from the psychologist. In this case, the ALJ addressed Dr. Stephenson's and Dr. Sloan's reports extensively, and her findings were not in conflict with the doctors' assessment that Plaintiff had a poor memory. (Tr. at 18-19). The ALJ noted that Plaintiff's complaints at the administrative hearing of poor concentration were confirmed by Dr. Stephenson and Dr. Sloan, and the ALJ thus determined that Plaintiff was capable of only "simple" work. (Tr. at 16, 19).

The U.S. Dep't of Labor's, *Dictionary of Occupational Titles* (4th ed. 1991) ("DOT") provides that a dowel inspector "inspects dowel pins for flaws, such as square ends, knots, or

14

splits, and discards defective dowels." DOT § 669.687-014. The job of a nut sorter is to look for defective nut meats as well as foreign materials on a conveyor belt and pick them out. DOT § 521.687-076. These are both one to two-step jobs. *See* DOT, Appendix C, Definition of "01 Level Reasoning Development." Thus, there is substantial evidence in the record to support the ALJ's finding that Plaintiff could perform those jobs, given her RFC. *Greenspan*, 38 F.3d at 236.

### III. CONCLUSION

For the foregoing reasons, the undersigned **DENIES** Plaintiff's *Motion for Summary Judgment* (Doc. 21) and **GRANTS** Defendant's *Motion for Summary Judgment* (Doc. 22).

**SO ORDERED** on August 4, 2011.

_____
RENÉE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE